Filed 7/29/22  In re B.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re B.M. et al., Persons Coming under the Juvenile Court Law. | D080084 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3990A-B) |
| v. | |
| E.W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel for Plaintiff and Respondent.

E.W. (Mother) appeals the juvenile court's order terminating her parental rights for her two children, B.M. and G.W. (Welf. & Inst. Code, § 366.26.)[1] Mother contends the juvenile court abused its discretion and applied an incorrect legal standard in finding the parental-benefit exception to adoption did not apply to prevent adoption. (§ 366.26, subd. (c)(1)(B)(i).) We disagree and affirm the juvenile court's order.

BACKGROUND

A.    *Family History*

Mother has two children, B.M. and G.W.[2] G.W. was born with fetal alcohol syndrome and has a number of significant medical conditions. Based on evidence of Mother's alcohol use during her pregnancy with G.W., Mother had a prior dependency proceeding with family maintenance services. Jurisdiction was terminated after Mother completed a substance abuse program, tested negative for drugs and alcohol, and completed a parenting program.

B.    *Initiation of Current Proceedings*

In August 2019, then three-year-old G.W. was found walking alone two houses away from the family home in the early hours of the morning while Mother, who had relapsed with alcohol, was asleep in a nearby garage. The maternal grandfather, who was supposed to be watching the children, had also fallen asleep. A few weeks later, seven-year-old B.M. was left alone in the home, reportedly under the supervision of an intoxicated neighbor who was supposed to keep an eye on the family home from across the street.

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

[2]    B.M.'s father, whose rights were also terminated, is not a party to this appeal. G.W.'s father is unknown.

The San Diego County Health and Human Services Agency (Agency) filed petitions under section 300, subdivision (b) on behalf of both children in September 2019 alleging that Mother's substance abuse rendered her unable to safely care for the children. Additionally, the Agency alleged that Mother had failed to take G.W. to appointments with her medical specialists, including a gastroenterology clinic to address concerns of failure to thrive and malnutrition. The child had not been seen by a pediatrician for over 13 months. G.W.'s gastric tube (G-tube), which she needed for supplemental nutrition, was not working properly and she was malnourished. B.M. was not enrolled in school, although he was of school age.

The juvenile court issued protective custody warrants. At the detention hearing, the children were detained in licensed foster care and Mother was given supervised visitation.

While the children were at an emergency children's shelter, Mother visited them once. B.M. expressed anger and disappointment that Mother did not regularly visit. Mother also did not attend scheduled medical visits.

The children were placed in separate licensed resource homes in October 2019. The juvenile court made true findings on both children's petitions at a contested jurisdictional hearing in November 2019 and continued the disposition hearing.

By the time of the contested disposition hearing in January 2020, Mother had visited G.W. twice and B.M. three times in their current homes. She was encouraged to visit more regularly. The court removed the children from Mother's care and ordered reunification services.

C. *Six-Month Review Period.*

B.M. was placed in the out-of-state home of his paternal grandmother in May 2020. The Agency planned to place G.W. in the home once her

3

medical services could be transferred to that state and grandmother was trained for G-tube feeding.

Mother was receiving inpatient substance abuse treatment, but had limited contact with the children. She rarely followed through with scheduled phone calls or video chats.

By the time of the six-month review in July 2020, Mother was still engaged in her inpatient program. The Agency continued to be concerned that her visits were sporadic and she did not accept or understand G.W.'s medical needs. B.M. had negative emotional reactions to Mother's sporadic contact and often cried during video chats with his sister. He appeared to do better after being placed with his grandmother. Overall, the children were doing well in their placements and the Agency continued to work to obtain approval to place G.W. with B.M.'s grandmother.

Over the next couple of months, before the contested trial on the six-month review, Mother participated more consistently in her substance abuse treatment program. She completed an intensive outpatient program and resided in a sober living residence. She was more consistent in her phone calls with the children and had in-person supervised visits with G.W. twice a week. Mother was encouraged to attend as many medical appointments as possible. However, she failed to appear for a sedated hearing procedure in August 2020, which required her consent to proceed. The appointment went forward after she gave verbal consent.[3]

The Agency paused efforts to place G.W. with B.M. to facilitate in-person visits between Mother and G.W. The juvenile court extended

---

[3]    Mother originally stated she did not attend the appointment because she did not have money for gas. She later admitted she "messed up."

reunification services to the 12-month review hearing date and the children remained in their respective placements.

D.     *Twelve-Month Review Period*

By November 2020, both children were thriving in their placements. Mother was more consistent with her calls and video visits with B.M. The Agency scheduled in-person visits for Mother with G.W. under the supervision of a visitation coach to evaluate progression toward unsupervised visits with G.W. The Agency was still concerned that Mother needed to involve herself more in G.W.'s medical needs and in B.M.'s education.

Mother did well with her visits. According to the visitation coach, Mother was appropriate and loving with G.W. and supervised her well. Mother had some struggles with time management, including scheduling appointments at the same time as her scheduled visits with G.W. There were some inconsistent video visits with B.M. and instances when Mother either did not appear as scheduled or did not respond to calls for several hours. These instances were upsetting to B.M.

At the contested 12-month review hearing on January 11, 2021, the court ordered unsupervised visits and extended reunification services to the 18-month review date.

E.     *18-Month Review Period and Termination of Services.*

By the 18-month review date, March 17, 2021, the Agency recommended termination of Mother's reunification services. B.M.'s therapist expressed concern that B.M. had been parentified, by taking on an unhealthy role that was beyond being a brother or a son. B.M. missed Mother and G.W. but his level of worry and concern was more normal than it was when he first moved. He had settled into his life with his grandmother and was able to be a child engaged in age-appropriate activities. The

5

therapist stated, " 'Basically, the psychological impact of being away from his Mom has been addressed; he has worked through his grief; he accepted his current family dynamic and moved forward.' "

Mother still had difficulty meeting G.W.'s medical needs and failed to attend medical appointments. Mother had unsupervised visits with G.W. and participated in her morning routine. G.W. returned to the caregiver on one occasion with the G-tube wrap placed inappropriately. Mother reported that the unsupervised visits with G.W. went well, but G.W. showed aggressive or uncharacteristic behavior after these visits. Mother did not finish homework assignments with G.W. and expressed frustration about needing to do homework rather than having fun. Mother also missed visits, which was upsetting to G.W.

B.M. came to San Diego in May 2021 with his grandmother for a visit with G.W. and Mother. Mother failed to pick up G.W. as scheduled or to call and cancel. Mother attended the visit with B.M., but he was upset that G.W. was not there. G.W. was also upset, so her caregiver brought her to visit the grandmother and B.M. later that evening. The children enjoyed their time together. The next day Mother had an extended visit with B.M. After returning home, B.M. had some anxiety and experienced some bedwetting.

The Agency expressed concern that Mother still missed important medical or educational appointments. Most concerning, however, was that G.W. was losing weight since the unsupervised visits with the mother had expanded. The Agency reduced the number of visits between Mother and G.W. due to concerns about G.W.'s weight loss. Mother became depressed and failed to attend scheduled visits and calls with B.M. There were concerns that Mother was coaching both children about things to say during

unsupervised visits. There were also concerns that the children's behaviors were regressing.

At the Agency's request, Mother's visits were reverted to supervised status at the contested 18-month review hearing in July 2021. The court terminated Mother's reunification services after finding her progress was minimal toward alleviating or mitigating the causes necessitating placement. The court set the matter for hearing under section 366.26 to implement a permanent plan for the children.

F.     *Permanency Planning.*

Counsel for the children requested that G.W. be placed with B.M.'s grandmother. G.W. was moved on October 22, 2021, after the Agency received approval for G.W. to be placed with B.M.'s grandmother.

Before G.W. moved out of state, Mother and G.W. had three scheduled in-person visits. Mother missed one visit. G.W. appeared to enjoy the visits with Mother and they expressed their love for one another. However, G.W. did not show signs of distress when the visits ended. After the move, both children engaged in video visits with Mother and expressed love for Mother.

The Agency recommended that both children be adopted by B.M.'s grandmother. The grandmother was committed to adopting them and both children wanted to remain with her. B.M. understood the concept of adoption. The children had an affectionate and loving relationship with Mother, but the relationship was similar to that of a close relative. They enjoyed spending time with Mother, but were not distressed when the visits ended.

Mother filed a section 388 petition requesting that the children be returned to her care. The juvenile court granted an evidentiary hearing.

G.    *Combined Contested Hearing.*

The matter proceeded to a contested hearing on February 4, 2022 for both the section 388 petition and section 366.26 permanency planning.

Mother testified about her services including trauma therapy, a recovery bible study, and a recovery program that includes random drug testing, which were negative. She saw a psychiatrist who manages her medication. She has taken her medication consistently for two years after she completed a four-month inpatient program. She took parenting classes and attended individual therapy for about a year. Mother stopped attending therapy when the court terminated services in July 2021. She agreed that even with the medication, she missed some visits with the children because she was too depressed to visit.

Mother testified that she has not used alcohol or substances other than her prescribed medications since she entered an inpatient program in February 2020. When she moved to a sober living facility, she enrolled in an outpatient substance abuse program where she had cognitive behavioral therapy.

Mother lost weight and looked forward to being able to engage and play more actively with her children. She wanted to play football with B.M., who shared her interest in the sport. She investigated a local flag football team for him.

Mother had a job. She and her father rented a three-bedroom home. She planned that B.M. would have his own room and she would share a room with G.W. Mother admitted she was living with her father in the same area where she lived when she was struggling with sobriety and the events occurred that precipitated the dependency action.

8

Mother testified about her understanding of G.W.'s significant medical needs. She believed she could keep all the necessary medical appointments because she had a good job with flexibility and a car. She testified about her plans for the children's education and for obtaining services for G.W. through the Regional Center.

Mother understood the children were removed because G.W. was malnourished. Mother acknowledged that G.W. missed a lot of appointments and that Mother avoided the Agency during that time because she had relapsed.

Mother agreed that there were concerns about her unsupervised visits with G.W. in March 2021. Mother missed two doctor appointments and she was late to several visits. When Mother was more than 30 minutes late to one visit, G.W. was inconsolable.

On the occasion when B.M. visited from out of state, Mother acknowledged she missed picking up G.W. and then said there was a misunderstanding about the meeting at a fast-food restaurant.

Mother said her visits were reverted to supervised status because a social worker was concerned that G.W.'s weight fluctuated. Mother thought the social worker blew the concern out of proportion to keep the case going. Mother acknowledged that the social worker was concerned about what Mother was feeding G.W. and the fact that she came back from some visits with bumps on her head. The social worker also wanted Mother to communicate better if she was going to be late.

Mother was not sure why B.M.'s visits were reverted to supervised status. She understood there was some concern that she said something inappropriate during their visits. She did not remember what she said or what the social worker said about the concerns.

9

The social worker who handled the case after Mother's services were terminated testified that Mother's visits were reverted from unsupervised to supervised status because G.W. lost weight and Mother failed to take G.W. to doctor appointments. This was concerning because G.W. was detained for similar concerns of missed medical appointments and malnutrition. These issues were not addressed after 20 months of reunification services. Mother also discussed inappropriate matters during visits with B.M.

The social worker did not believe it was in the best interests of either B.M. or G.W. to be returned to Mother. The children were placed together with B.M.'s grandmother. B.M. had stability at home, at school and with his therapy services. Similarly, the grandmother was meeting G.W.'s medical and educational needs. Both children expressed they were happy with their placement.

Mother missed three virtual visits in November and December 2021. She said there was a change in the date for one visit and she could not make it because she went to work. The social worker observed that neither child had an emotional reaction to waiting for Mother or to the fact that she did not appear for the visit.

B.M. declined visits with Mother a few times. Mother's relationship with B.M. was like a friendly visitor. He was happy to see her and enjoyed when she sent him things, but he did not ask for her outside of visits. He did not appear to care if a visit was canceled. G.W. declined visits with Mother more often than B.M. Mother's relationship with G.W. was also like a friendly visitor. G.W. was happy to see her during visits, but did not ask for her outside of visits. If a visit was canceled, G.W. went back to her routine.

Mother never asked the social worker for educational updates about the children. Mother did not communicate with the children's teachers out of state.

The social worker recommended adoption for both children. She considered the relationship with Mother against the benefits of adoption, including the stability of placement with the current caregiver and the sibling. For G.W., the social worker also considered her medical and developmental needs. She also considered how the children would react if they did not have visitation with Mother.

The court denied Mother's section 388 petition. Although the court noted that Mother made good strides over the years toward sobriety, participating in therapy, and in maintaining a home, it determined that there was not a change in circumstances since reunification services were terminated. The court determined that placement with Mother would not be in the best interests of the children. The court believed that Mother has some grasp of the children's needs and loved them, but that she had not demonstrated an ability to meet the needs of either child, and G.W. in particular, to indicate that returning them to her care would be in their best interests. The court noted that B.M. was able to "shed the weight of having to act as a parent of himself and of [G.W.]" in his current placement whereas there was a question about whether he could return to Mother and still be a child.

In the section 366.26 portion of the hearing, the Agency recommended adoption as the permanent plan for both children. Mother asked the court to find that the parent-benefit exception applied to prevent adoption of the children. After hearing arguments from counsel, the court found by clear and convincing evidence that both children were generally and specifically

11

adoptable.  The court considered the three prongs necessary for the parent-benefit exception:  regular and consistent visitation, the existence of a beneficial relationship, and whether such a relationship outweighed the benefits of an adoptive home.  After discussing the factors, the court found the exception did not apply.  The court terminated Mother's parental rights and found adoption was in the best interests of the children.  Mother appealed this ruling.

## DISCUSSION

## I.

### *General Legal Principles*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed."  (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)  At this hearing "the juvenile court has three options:  (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care.  [Citation.]  Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan.  [Citation.]  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions."  (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the parental-benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  A parent asserting this exception must show by a preponderance of the evidence:  (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the

countervailing benefit of a new, adoptive home. (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

The first element, visitation, is "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) The second element focuses on the child and is determined by taking into consideration factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.,* citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.,* at p. 633.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court does not compare the attributes of the parent against those of the custodial caregiver. (*Caden C., supra,* 11 Cal.5th at p. 634.) Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative. (*Id.* at p. 637.) A parent's inability to address the issues leading to dependency may be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid.*) Performing this analysis is a "subtle enterprise." (*Id.* at p. 634.) "In many cases, 'the strength and quality of the natural

13

parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Ibid.*)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.)

"[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

The *Caden C.* court explained, " 'there likely will be no practical difference in application of these two standards,' " but "[a]t its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

## II.

### *The Juvenile Court Did Not Abuse Its Discretion in Terminating Parental Rights*

Mother contends the juvenile court abused its discretion and considered improper factors to deny the parent-benefit exception. Specifically, she contends the court improperly considered whether Mother had a parental bond with the children and improperly compared the adoptive home to Mother's home. Mother asks us to reverse the order and remand with instruction to reevaluate the parent-child relationship exception. We disagree and decline to do so because the court considered each of the three factors for the parent-benefit exception and properly exercised its discretion.

A.    *Visitation.*

As to the first factor, the court noted that Mother's visitation was historically inconsistent, but that that her visits recently were more consistent. For purposes of its analysis, however, the court assumed that this prong was met.

B.    *Beneficial Relationship.*

The court next turned to the existence a beneficial relationship. The court observed that the children undoubtedly loved Mother and that she loved them. The court stated, however, "the question is whether or not this is a bond, a relationship more than just a friendship. It has to be a relationship and a bond that is parental." The court observed that the children separated easily from Mother after visits. Although the court recalled that G.W. was upset when Mother missed visits at the beginning of the case, that was not the case recently. When Mother was late or did not appear for a visit, the children returned to their routines without emotion. The court expressed concern about the healthiness of the children's relationship with Mother,

15

particularly about the evidence that B.M. took on an parental role in the relationship with his Mother and sister that was not suitable for a child his age.

Mother contends that the court's comment that a "parental" bond is required is improper. It is clear that "the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].) The exception requires the existence " " 'of a substantial, positive emotional attachment' " between parent and child." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 319 citing *Caden C.*, *supra*, 11 Cal.5th at p. 633 and quoting *Autumn H.*, *supra*, 27 Cal.4th at p. 575.)

The *Katherine J.* court recently explained that a "popular way in which courts have tried to discern the presence of 'the mysterious X factor' that transforms a person from a 'mere friendly visitor' to a parent with ' "a substantial, positive, emotional attachment" ' to [her] child is by analyzing whether the person occupies a 'parental role' in the child's life. [Citation.] However, this analytic tool has the potential to create more problems than it solves" because the words " ' "parental role," standing alone can have several meanings' ranging from 'the person whom the child regards as his or her parent,' the person who demonstrates the 'nurturing, supportive, and guiding' characteristics traditionally associated with 'good' parenting, or 'giving

16

parental care' through such activities as 'changing diapers, providing toys and food, and helping with homework.' " (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 319 quoting *In re L.A.-O* (2021) 73 Cal.App.5th 197, 210.) "While each of these definitions may be useful as *factors* to determine the strength of a parent's relationship with their child, none is dispositive on its own." Therefore, it is helpful for the court to explain the meaning it imparts. (*Katherine J.*, at p. 319.)

The court here did not compare the care the children received from the grandmother to that provided by Mother. Rather, the court's statements make it evident that it concluded the children's attachment to Mother was not of sufficient health, quality, and significance to show a beneficial parent-child relationship. The court explained that the children did not express emotion when they separated from Mother or when she failed to appear as scheduled for visits. Their reactions, or lack thereof, demonstrate that they view her more as a friendly visitor than a person they regard as their parent.

The record supports this finding. G.W. had been out of Mother's care for more than half of her life when parental rights were terminated. Although B.M. had spent more time with Mother, there was evidence that he was more bonded to his sister than to Mother. Once he was out of Mother's care, he was able to focus on being a child rather than worrying about Mother or his sister. When G.W. was placed in grandmother's home with B.M., he no longer expressed a desire to return to Mother and no longer had an emotional reaction when Mother did not appear for visits.

Although the court questioned the existence of a beneficial parent relationship, the court ultimately assumed that such a relationship existed and proceeded to the next step–balancing that relationship against the general benefits of an adoptive home. Therefore, even if the court's comment

17

about requiring a "parental" relationship could be viewed as error, any error was harmless.

C.     *Lack of Detriment in Terminating Relationship.*

Mother next contends the court improperly compared the potential adoptive home to that of Mother.  However, the court explained that it did not look at the specific adoptive home and was not comparing that home to Mother's.  Rather, the court properly recognized the question was whether this relationship is such that "if it were to be severed, this would be of a detrimental nature that outweighs the permanency and stability that an adoptive home would give."

The court considered Mother's counsel's arguments that the children would be "devastated" by the termination of the relationship.  The court found there was simply no evidentiary support for this argument.  Although the court thought there would be an adjustment period, the court stated that the children no longer wished to go home.  The court commented that their needs were being met at their current placement.  The court concluded that the children needed the stability of an adoptive home.  Therefore, the court found the exception did not apply.

We cannot conclude that the court improperly compared the adoptive home with that of Mother's.  Rather, we infer that the court was commenting on the benefits a stable adoptive home would provide as opposed to maintaining an insecure relationship with Mother.  There was evidence that B.M. made positive emotional strides through therapy and a stable placement, which enabled him to cope with any grief associated with separating from Mother.  B.M. said he wanted to be adopted and to have a family, even if that meant he could not talk to his parents again.  He acknowledged that he "would not be happy at first" but believed he "will feel

18

fine." Mother simply did not meet her burden of showing that any detriment the children might endure from the termination of their relationship with Mother outweighed the stability the children would enjoy in an adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

Viewing the evidence in the light most favorable to the juvenile court's order (*Caden C.*, *supra*, 11 Cal.5th at p. 640), as we must, we conclude substantial evidence supported the court's factual findings and the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption.

DISPOSITION

The order is affirmed.

IRION, J.

WE CONCUR:


AARON, Acting P. J.


DATO, J.